T.C. Memo. 2014-13

UNITED STATES TAX COURT

STEVENS TECHNOLOGIES, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1996-11L.                    Filed January 27, 2014.

Sarah Stevens (an officer), for petitioner.

James R. Rich, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, Judge:  Stevens Technologies, Inc. (the "company"),

petitioned the Court under section 6330(d)(1) to review the determination of the

IRS Appeals Office sustaining proposed levies and filings of notices of liens to

**[*2]** collect employment-tax liabilities, additions to tax, and penalties assessed against the company.[1] The issues for decision are:[2]

1. Can the Court consider the correctness of the amounts of employment taxes that the company reported on its Forms 941 ("Employers' Quarterly Federal Tax Return") for the fourth quarter of 2009, the first quarter of 2010, and the second quarter of 2010?

2. Did the company have reasonable cause for failing to file Forms 941 for a number of quarters in the years 2005 through 2008,[3] pay employment taxes for a number of quarters in the years 2005 through 2010,[4] deposit

---

[1]Unless otherwise indicated, all references to sections are to the Internal Revenue Code of 1986, as amended and as in effect at all relevant times.

[2]On December 3, 2012, the respondent (the IRS) made an oral motion to impose sanctions on the company for its alleged failure to comply with two orders of the Court dated March 26, 2012, which had required the company to produce documents and respond to interrogatories. The motion sought to bar the company from presenting any evidence. We reserved ruling on the motion until after trial. We will deny this motion as moot because, as we explain below, the evidence in the record does not support any ultimate finding of fact in the company's favor.

[3]2Q, 3Q, 4Q 2005; 1Q, 2Q, 3Q 2006; 1Q, 2Q, 3Q, 4Q 2007; 3Q, 4Q 2008. We sometimes use the letter "Q" as an abbreviation for quarter.

[4]2Q, 3Q, 4Q 2005; 1Q, 2Q, 3Q 2006; 1Q, 2Q, 3Q, 4Q 2007; 3Q, 4Q 2008; 4Q 2009; 1Q, 2Q 2010.

[*3]    employment taxes for a number of quarters in the years 2005 through 2010,[5] pay Federal Unemployment Tax Act (FUTA) tax for the tax year 2009, and file Forms W-2 ("Wage and Tax Statement") for 2005?

3.    Did the IRS violate section 6330(e) by (a) issuing a summons to Wachovia Bank pursuant to its investigation of the company's president, Sarah Stevens, for the trust-fund-recovery penalties and (b) notifying Stevens it intended to levy on her assets to collect the liabilities?

4.    Did the Appeals Office abuse its discretion by failing to accept the company's installment-agreement proposal?

FINDINGS OF FACT

The parties entered into a stipulation of facts. We incorporate the stipulation of facts into our findings of fact. At the time it filed the petition, the principal place of business of the company (that is, Stevens Technologies, Inc.) was Charlotte, North Carolina. Therefore, any appeal of our decision in this case will be resolved by the Court of Appeals for the Fourth Circuit unless the parties stipulate another circuit. See sec. 7482(b)(1)(B); 28 U.S.C. sec. 41 (2012).

---

[5]3Q, 4Q 2005; 2Q, 3Q 2006; 1Q, 2Q, 3Q 2007; 3Q, 4Q 2008; 2Q, 4Q 2009; 1Q, 2Q 2010.

[*4] In 2004, the company was incorporated by Sarah Stevens ("Stevens"). From 2005 through 2010, the company was a federal contractor that provided computer consulting and information-technology services to federal agencies, including the National Aeronautics and Space Administration and the Tennessee Valley Authority ("TVA"). During the years 2004 through 2010, Stevens was the company's president. The company's gross receipts, which were shown on its Forms 1120, U.S. Corporation Income Tax Return, for the years 2004-09, were as follows:

| Year | Gross receipts |
|------|----------------|
| 2004 | -0- |
| 2005 | $692,450 |
| 2006 | 309,170 |
| 2007 | 929,940 |
| 2008 | 668,470 |
| 2009 | 1,544,262 |

The company issued a Form W-2 to Stevens each year. These forms showed the following information:

[*5]

| Year | Wages | Income tax withheld | Social Security | Medicare |
|------|-------|---------------------|-----------------|----------|
| 2005 | $54,002 | $6,818 | $3,348 | $796 |
| 2006 | 80,783 | 9,319 | 5,199 | 1,216 |
| 2007 | 107,195 | 11,652 | 6,045 | 1,736 |
| 2008 | 106,050 | 8,908 | 6,324 | 1,537 |
| 2009 | 96,596 | 11,542 | 6,621 | 1,566 |
| 2010 | 73,720 | 5,564 | 4,570 | 1,068 |

In 2005 and 2006, Stevens was also employed by Robert Half Corp., a company for which she performed computer audits. She received $78,270 in wage income from Robert Half Corp. in 2005 and $10,710 in 2006.

During all relevant periods, Stevens had the authority to determine which bills the company would pay at any given time, the authority to determine when payroll would be paid, and the responsibility for hiring employees.

In 2005, the company hired an accounting firm, A.F. McGervey & Co., LLC, to assist with bookkeeping, financial statements, and payroll. The accounting firm assigned Paul Impellicceiri, a certified public accountant, to work on the company's account. The accounting firm's staff prepared checks, electronically, for Stevens's approval. Stevens was responsible for approving the

[*6] checks to pay the employment-tax deposits for the company. The accounting firm's staff prepared and sent to Stevens the Forms 941 for the company for the last quarter of 2005 and all quarters in 2006, 2007, 2008, 2009, and 2010, before the due date for each return.

The company filed its Forms 941 on the following dates:

| Tax period | Due date (unadjusted for Saturdays, Sundays, and holidays) | Date filed | Was return filed late? |
|---|---|---|---|
| 1Q 2005 | 4/30/05 | 12/8/05 | Late |
| 2Q 2005 | 7/31/05 | [1]2/1/06 | Late |
| 3Q 2005 | 10/31/05 | 2/1/06 | Late |
| 4Q 2005 | 1/31/06 | 9/10/07 | Late |
| 1Q 2006 | 4/30/06 | 9/30/09 | Late |
| 2Q 2006 | 7/31/06 | 9/30/09 | Late |
| 3Q 2006 | 10/31/06 | 9/30/09 | Late |
| 4Q 2006 | 1/31/07 | 6/11/09 | Late |
| 1Q 2007 | 4/30/07 | 9/30/09 | Late |
| 2Q 2007 | 7/31/07 | 9/30/09 | Late |
| 3Q 2007 | 10/31/07 | 9/30/09 | Late |
| 4Q 2007 | 1/31/08 | 8/5/09 | Late |
| 1Q 2008 | 4/30/08 | [2]4/30/08 | |

**[*7]**

| | | | |
|---|---|---|---|
| 2Q 2008 | 7/31/08 | 9/30/09 | Late |
| 3Q 2008 | 10/31/08 | 9/30/09 | Late |
| 4Q 2008 | 1/31/09 | 9/30/09 | Late |
| 1Q 2009 | 4/30/09 | [3]5/2/09 | Late |
| 2Q 2009 | 7/31/09 | 7/31/09 | |
| 3Q 2009 | 10/31/09 | 10/31/09 | |
| 4Q 2009 | [4]1/31/10 | 2/1/10 | |
| 1Q 2010 | 4/30/10 | 4/30/10 | |
| 2Q 2010 | 7/31/10 | 7/31/10 | |
| 3Q 2010 | 10/31/10 | 10/31/10 | |
| 4Q 2010 | 1/31/11 | 4/28/11 | Late |

[1]In its brief, the IRS contends that the return was filed on February 1, 2005, which would be six months before the due date of the return. This appears to be a typographical error. Its records show a notation "RETURN FILED" with a corresponding date of February 1, 2006. Furthermore, the IRS assessed a penalty for failing to timely file a return for the quarter and the company does not dispute that it failed to timely file a return.

[2]The IRS contends that the return was a substitute for return, i.e., a return filed by the IRS. However, its records for the quarter show a notation "RETURN FILED". There is no notation that the return was a substitute for return. We conclude that the return was not a substitute for return. The IRS also contends that the return was filed late. However, its records show that return was filed on its due date. The IRS did not assess a penalty for failing to timely file a return for the quarter.

[3]The IRS contends that the return was a substitute for return. However, its records for the quarter show a notation "RETURN FILED". There is no notation that the return was a substitute for return. We conclude that the return was not a

[*8] substitute for return.  The IRS did not assess a penalty for failing to file a timely return for the quarter.

[4]This day was a Sunday, so the actual due date was the following day, February 1, 2010.  See sec. 7503.

The company made the following federal-employment-tax deposits and payments from 2005 through 2010:[6]

| Year | Date of deposit or payment | Tax period to which deposit or payment applied | Amount |
|------|------|------|------|
| 2005 | 4/19/05 | 1Q 2005 | $25,388.52 |
|      | 11/14/05 | 2Q 2005 | 47,463.04 |
|      | 11/14/05 | 3Q 2005 | 33,238.20 |
| 2006 | 10/13/06 | 1Q 2006 | 5,000.00 |
| 2007 | 4/10/07 | 1Q 2006 | 8,601.32 |
|      | 4/10/07 | 2Q 2006 | 3,327.32 |
|      | 5/22/07 | 2Q 2007 | 7,944.20 |
|      | 5/29/07 | 2Q 2007 | 7,509.28 |
|      | 8/29/07 | 3Q 2007 | 11,986.66 |
| 2008 | 1/7/08 | 4Q 2007 | 4,490.66 |
|      | 1/7/08 | 4Q 2007 | 4,984.16 |
|      | 2/5/08 | 1Q 2008 | 4,659.53 |
|      | 2/21/08 | 1Q 2008 | 1,186.32 |
|      | 2/21/08 | 1Q 2008 | 3,430.19 |
|      | 3/17/08 | 1Q 2008 | 4,535.23 |
|      | 3/26/08 | 4Q 2005 | 362.42 |
|      | 3/28/08 | 1Q 2008 | 4,472.39 |
|      | 4/10/08 | 1Q 2008 | 5,124.01 |

[6]The table does not include FUTA payments.

| | **[*9]** | | |
|---|---|---|---|
| | 5/21/08 | 2Q 2008 | 10,061.11 |
| | 6/18/08 | 2Q 2008 | 9,609.24 |
| | 8/1/08 | 2Q 2008 | 10,349.61 |
| | 8/29/08 | 3Q 2008 | 10,697.64 |
| | 10/29/08 | 3Q 2008 | 10,706.10 |
| 2009 | 6/3/09 | 1Q 2009 | 12,244.37 |
| | 7/15/09 | 1Q 2009 | 22,435.79 |
| | 8/3/09 | 2Q 2009 | 41,198.63 |
| | 9/30/09 | 2Q 2005 | 13,225.96 |
| | 9/30/09 | 3Q 2005 | 10,239.37 |
| | 9/30/09 | 4Q 2005 | 34,478.70 |
| | 9/30/09 | 3Q 2006 | 22,150.62 |
| | 9/30/09 | 4Q 2006 | [1]23,993.44 |
| | 9/30/09 | 1Q 2007 | 43,856.02 |
| | 9/30/09 | 2Q 2007 | 32,331.69 |
| | 9/30/09 | 3Q 2007 | 11,697.98 |
| | 9/30/09 | 4Q 2007 | 22,018.36 |
| | 9/30/09 | 3Q 2008 | 11,137.88 |
| | 9/30/09 | 4Q 2008 | 35,283.90 |
| | 10/2/09 | 3Q 2009 | 10,178.31 |
| | 10/2/09 | 3Q 2009 | 27,472.03 |
| | 10/2/09 | 3Q 2009 | 21,939.78 |
| 2010 | 3/15/10 | 4Q 2009 | 3,308.07 |
| | 10/4/10 | 4Q 2010 | 6,825.23 |
| | 10/20/10 | 4Q 2010 | 6,378.51 |
| | 11/4/10 | 4Q 2010 | 6,277.65 |
| | 11/16/10 | 3Q 2010 | 44,465.16 |
| | 11/22/10 | 4Q 2010 | 4,274.79 |
| | 12/9/10 | 4Q 2010 | 731.71 |
| | 12/23/10 | 4Q 2010 | 731.73 |
| | 1/7/11 | 4Q 2010 | 731.73 |

[1]The parties stipulated that the payment amount was $22,993.44, but the company's bank statement shows that the amount is actually $23,993.44. The IRS did not assess a penalty for failing to timely pay or make deposits for this quarter.

[*10] Regarding the company's Form 941 obligations (i.e., its obligations to file Form 941 and to deposit and pay quarterly employment taxes), the IRS assessed against the company additions to tax for failing to timely file, additions to tax for failing to timely pay, and penalties for failing to timely deposit. The amounts of the assessments are:

| Tax period ending | Failing to timely file | Failing to timely pay | Failing to timely deposit |
|---|---|---|---|
| 6/30/2005 | $10,916.50 | $949.26 | -0- |
| 9/30/2005 | 6,481.45 | 166.19 | $3,323.82 |
| 12/31/2005 | 7,757.71 | 8,576.18 | 5,171.80 |
| 3/31/2006 | 3,060.30 | 666.08 | -0- |
| 6/30/2006 | 748.65 | 149.73 | 332.73 |
| 9/30/2006 | 4,983.89 | 3,876.36 | 2,215.06 |
| 3/31/2007 | 9,867.60 | 6,359.12 | 4,385.60 |
| 6/30/2007 | 7,274.63 | 4,203.12 | 3,782.99 |
| 9/30/2007 | 2,632.05 | 1,345.27 | 1,973.71 |
| 12/31/2007 | 4,954.13 | 2,201.84 | -0- |
| 9/30/2008 | 2,506.02 | 612.58 | 2,892.17 |
| 12/31/2008 | 7,938.88 | 1,411.36 | 3,528.36 |
| 6/30/2009 | -0- | -0- | 4,119.86 |
| 12/31/2009 | -0- | 330.81 | 9,924.19 |
| 3/31/2010 | -0- | 176.74 | 5,302.10 |
| 6/30/2010 | -0- | 250.65 | 7,519.34 |

[*11] In 2005, Stevens began to suffer heart problems. In 2005, after a difficult pregnancy, Stevens gave birth to a daughter. Because of Stevens's poor health, the birth took place in the intensive care unit of the hospital. Her child was born with a cancerous tumor on her skull. Near the end of 2006, the tumor was removed.

At the end of 2006, Stevens's mother was diagnosed with cancer. Stevens began caring for her mother at her mother and father's house in Pennsylvania. During this time she commuted to Charlotte, where the company was based.

During 2007, Stevens continued to suffer from heart problems that eventually required surgery.

In March 2007, Stevens moved from Pennsylvania back to her home in Charlotte with her mother.[7] There, she cared for her mother until about six weeks before her mother's death in November 2008 in Pennsylvania. Stevens's heart problems (which had began in 2005), her difficult pregnancy (in 2005), her daughter's tumor (which was removed at the end of 2006), her mother's sickness (which began at the end of 2006 and ended with her death in November 2008), meant that Stevens could spend only a limited time on the company's affairs.

---

[7]She and her mother spent a week in Raleigh, North Carolina, while her mother was being treated at Duke University Medical Center.

[*12] On February 18, 2008, the IRS assessed a $360 penalty against the company under section 6721 for the annual tax period ending December 31, 2005, for failure to timely file Form W-2.

From 2005 through 2008, Stevens posted sporadic comments and advice on an educational listserv (an electronic bulletin board). She made 12 posts in 2005, 1 post in 2006, 7 posts in 2007, 10 posts in 2008, and 1 post in 2009.

In 2008, Stevens attended the American Institute of Aeronautics and Astronautics Space 2008 Conference and Exposition in San Diego, California, and gave a lecture entitled "Security Considerations for Global Systems of Systems". In 2008, Stevens had a speaking engagement in North Dakota.

After Stevens's mother died in November 2008, Stevens began to devote more time to the company. She was able to concentrate on the company's tax problems with the assistance of Impellicceiri.

In 2009, the company contracted to provide services to the TVA. The TVA failed to schedule some work during the fourth quarter of 2009.

In September 2009, the company filed some of its overdue Forms 941 and paid approximately $261,000 toward its overdue federal tax. The company was able to make the $261,000 payment because it had received payments from the TVA.

**[*13]** On October 13, 2009, Stevens contacted an IRS collection specialist to ascertain whether the IRS had received the company's delinquent tax returns. During the conversation, a collection specialist explained to Stevens that the company owed the IRS penalties and interest because of late payments. Stevens asked that the company's account be assigned to a revenue officer. Stevens also stated that the company was current with its deposits.

In 2009, Stevens entered the "Make Mine a Million Dollar Business" contest, sponsored by Count Me In, Inc., a nonprofit organization whose purpose was to assist women entrepreneurs with their businesses. Stevens was selected as a finalist in the contest due to the growth of the company's revenue from $668,470 in 2008 to $1,544,262 in 2009 and her creation of jobs.

In January 2010, the National Science Foundation ("NSF") told the company that it was one of three final contenders for a large contract. There were delays in the NSF's awarding the contract, and by the time the contract was awarded in September 2011 the company had already gone out of business.

On February 1, 2010, the company timely filed its Form 940 ("Employer's Annual Federal Unemployment (FUTA) Tax Return"), for the 2009 year.

[*14] On February 22, 2010, the IRS made the following assessments related to the Form 940 for 2009: tax of $1,124.88, a failure-to-timely-pay addition to tax of $5.62, and interest of $2.72.

In February 2010, the company signed another contract with the TVA to provide services to it. This contract was for the period ending January 31, 2011, and for a sum not to exceed $1.5 million. From February to May 2010, the company performed work for the TVA pursuant to this contract. From April through August 20, 2010, the TVA made payments with respect to the contract.

In March 2010 Count Me In, Inc., and cosponsor American Express, Inc., announced that Stevens had won the contest grand prize of $100,000 because of her efforts in growing the company's business. As a result of winning the contest, in March 2010 Stevens appeared on the "Today Show", a national television program. During her "Today Show" interview, Stevens explained that she and her husband had continued to run the company while her mother was sick and living with them.

In March 2010, the TVA and the company agreed to a schedule under which the company would perform inspections of seven TVA facilities on various dates from May through September 2010. These inspections were part of the work to be performed under the second contract between the TVA and the company. The

[*15] inspections did not occur because the TVA did not permit the company access to its facilities.

On July 14, 2010, Stevens sent an email to the TVA complaining that the inspections had not been allowed as scheduled, that this had cost the company $175,000, and that the work for the upcoming week had been postponed until August. The same day, the TVA emailed Stevens back to ask whether the company could perform inspections of four TVA facilities on specific dates in July and August. The record does not reveal whether these inspections occurred.

The IRS assessed employment taxes for the fourth quarter of 2009 and the first and second quarters of 2010 in the respective amounts of $66,161.47, $35,347.65, and $50,129.25. The amounts assessed were the same amounts shown by the company on its Forms 941 as tax for these quarters.

On August 2, 2010, Stevens contacted IRS collection personnel to ask for the contact information for the revenue officer assigned to the company's case.

On August 12, 20, and 23, 2010, the IRS mailed notices of lien filings and notices of intent to levy to the company. (There were two lien-filing notices and three levy notices. The two lien-filing notices were mailed on August 12, 2010. Two of the three levy notices were mailed on August 20, 2010. The third levy notice was mailed on August 23, 2012). The notices advised the company that it

[*16] had the right to request a collection-review hearing with the IRS Appeals Office. The notices showed amounts of tax liabilities that the IRS had assessed by form number (or type of tax, i.e., section 6721) and by taxable period. The dates of the notices, type of notices (i.e., lien-filing or levy), form number (or type of tax), and assessed amount, are listed below:

| Tax form (or type of tax) | Period | 1st 8/12/10 lien-filing notice | 2d 8/12/10 lien-filing notice | 1st 8/20/10 levy notice[1] | 2d 8/20/10 levy notice[1] | 8/23/10 levy notice |
|---|---|---|---|---|---|---|
| 941 | 2Q 2005 | $3,596.40 | - - - | - - - | - - - | - - - |
| 941 | 3Q 2005 | 2,748.37 | - - - | - - - | - - - | - - - |
| 941 | 4Q 2005 | 28,527.07 | - - - | $28,527.07 | $28,527.07 | - - - |
| 941 | 1Q 2006 | 5,501.63 | - - - | 5,501.63 | 5,501.63 | - - - |
| 941 | 2Q 2006 | 1,628.62 | - - - | 1,628.62 | 1,628.62 | - - - |
| 941 | 3Q 2006 | 16,658.93 | - - - | 16,658.93 | 16,658.93 | - - - |
| 941 | 1Q 2007 | 29,140.55 | - - - | 29,140.55 | 29,140.55 | - - - |
| 941 | 2Q 2007 | 20,629.09 | - - - | 20,629.09 | 20,629.09 | - - - |
| 941 | 3Q 2007 | 7,567.53 | - - - | 7,567.53 | 7,567.53 | - - - |
| 941 | 4Q 2007 | 9,663.06 | - - - | 9,663.06 | 9,663.06 | - - - |
| 941 | 3Q 2008 | 6,615.03 | - - - | 6,615.03 | 6,615.03 | - - - |
| 941 | 4Q 2008 | 14,152.25 | - - - | 14,152.25 | 14,152.25 | - - - |
| 941 | 2Q 2009 | 4,119.86 | - - - | 4,119.86 | 4,119.86 | - - - |
| 941 | 4Q 2009 | 76,576.17 | - - - | 76,576.17 | 76,576.17 | - - - |
| 941 | 1Q 2010 | - - - | $40,919.58 | 40,919.58 | - - - | - - - |
| 941 | 2Q 2010 | - - - | - - - | - - - | - - - | $55,952.75 |
| 940 | 2009 | - - - | 1,133.22 | 1,133.22 | 1,133.22 | - - - |
| Sec. 6721 | 2005 | - - - | 360 | 360 | - - - | - - - |

[1] The lien-filing notices listed an "amount on lien" for each tax form (or type of tax) and period. The amounts were not given in further detail, e.g., the notices did not specify whether the amounts were for tax, penalty,

[*17] or interest. The levy notices listed, for each tax form (or type of tax) and period, the following information: "unpaid amount from prior notices", "additional penalty", and "additional interest". For lien-filing notices, the "amount on lien" is shown in the table. For levy notices, the amounts in the table include only "unpaid amount from prior notices", not "additional penalty" or "additional interest".

The first 8/20/10 levy notice listed the following amounts as "additional penalty": $2,315.64 for the 4Q 2009 liability, $706.94 for the 1Q 2010 liability, and $39.37 for the 2009 Form 940 liability. Amounts were listed as "additional interest" for all categories of liabilities for which an amount is listed as "unpaid amount from prior notices" except the 2Q 2009 liability and the sec. 6721 liability. Also, an amount for "additional interest" was listed for the 3Q 2005 liability. (No amount is listed for that quarter for "unpaid amount from prior notices.")

The second 8/20/10 levy notice listed the following amounts as "additional penalty": $2,315.64 for the 4Q 2009 liability and $39.37 for the 2009 Form 940 liability. Amounts were listed as "additional interest" for all categories of liabilities for which an amount is listed as "unpaid amount from prior notices". Also, an amount for "additional interest" was listed for the 3Q 2005 liability. (No amount is listed for that quarter for "unpaid amount from prior notices.").

The 8/23/10 levy notice listed $250.64 as "additional penalty" and $182.82 as "additional interest" for the 2Q 2010 liability.

On August 20, 2010, Stevens met with an IRS revenue officer to resolve the company's outstanding tax liabilities. Stevens told the revenue officer that the company "could not secure Government contracts" until it could demonstrate that it had established an agreement with the IRS to pay the liabilities. The revenue officer informed Stevens that because the company was not in compliance with its deposit requirements as the date of the meeting,[8] he would issue a notice of intent to levy.[9] The revenue officer informed Stevens that to avoid other collection action it would need to prospectively comply with its deposit requirements. The

---

[8]We observe that the IRS's records show that the company reported $50,129.25 of employment taxes on its Form 941 filed July 31, 2010, but that it made no deposits or payments of this amount.

[9]It is unclear whether this refers to the first levy notice issued on August 20, 2010, the second levy notice issued on August 20, 2010, or the levy notice issued on August 23, 2010.

[*18] revenue officer also requested that Stevens submit a completed Form 433-B, "Collection Information Statement for Businesses", within 30 days. The revenue officer and Stevens agreed to meet again on August 31, 2010, along with Impellicceiri.

On August 30, 2010, the company delinquently filed Forms 940 for the 2005, 2006, 2007, and 2008 years.[10]

On August 30, 2010, the company submitted a request for a collection-review hearing to the IRS Appeals Office. The request for the hearing stated that the basis for the request was "Filed Notice of Federal Tax Lien" and "Proposed Levy or Actual Levy". In its request for a hearing the company proposed that the IRS withdraw its lien filings and enter into an installment agreement with the company. The request did not challenge the amounts of tax assessed, such as the employment taxes assessed for the fourth quarter of 2009 and the first two quarters of 2010.[11]

---

[10]The company contends that it filed the returns on time. However, the IRS's records show that the returns were filed on August 30, 2010. There is no evidence to the contrary.

[11]The company contends that its request did challenge the amounts of employment taxes for the fourth quarter of 2009 and the first two quarters of 2010, but the request, which is in the record, stated only that "We request for fast track mediation to review lien and also company is a government contractor whose

(continued...)

[*19] On August 31, 2010, Stevens and Impellicceiri met with the revenue officer as previously arranged. At the meeting they requested abatement of additions to tax and penalties for reasonable cause. On the same day, the revenue officer reviewed the company's request for a collection-review hearing and referred the request to the Appeals Office. A settlement officer at the Appeals Office was assigned to handle the hearing.

By letter dated October 4, 2010, the Appeals Office acknowledged receipt of the company's request for a collection-review hearing and scheduled a telephone hearing for October 19, 2010. The letter stated that the IRS could consider whether the company owed the amounts due only if the company had not had a prior opportunity to dispute the amounts with the Appeals Office or had not received a statutory notice of deficiency. The telephone hearing was rescheduled for October 20, 2010.

On October 20, 2010, about one-half hour before the telephone hearing was scheduled to begin, Stevens faxed to the Appeals Office information for it to consider at the hearing. The information included the following summary:

---

[11](...continued)
award of future contracts was being limited. Extenuating financial circumstances has caused the company to fall behind on payment of employment tax liability." This statement does not challenge the amounts of taxes. The company does not contend that its request challenged any other amounts of employment taxes.

**[*20]** Information to be presented at STI IRS Collection Due Process Hearing

Section 1:  Evidence that taxpayer suffered severe emotional and physical distress that prevented capacity to think clearly and make appropriate financial decisions for the firm for the periods of June 30, 2005 - June 30, 2009.

Section 2:  Evidence that taxpayer did comply voluntarily and paid all taxes due for these periods as soon as monies were available to do so.

Section 3:  Evidence that collection activity has continued to persist after request for collection due process hearing.

1)      Filing of Federal Tax Lien on 09/21/2010 (Appeal Letter stated that appeal was timely and no collection action could be taken until after a decision was made in the case).

2)      Request for Trust Fund Recovery Penalty Assessment while the case was under Appeal.
Note:  Taxpayer is making these notations because of rights under the IRS tax code, and because taxpayer needs the determination of the hearing in order to determine how to proceed.  Taxpayer understands the importance of this hearing and the assessments and takes this VERY seriously.  For this reason, the taxpayer did meet with the collection agent about the Trust Fund Recovery Penalty.

Section 4:  Evidence that government has delayed contracting activity that has placed a tremendous burden on the taxpayer's business for the periods of December 2009 - June 30, 2010.

Section 5:  Evidence to support withdrawal of Federal Tax Lien, as per Publication 594, to allow us to pay our debt more quickly.

[*21] None of the material in the letter constituted a request for the IRS to consider whether the company owed the amounts of tax due.

Stevens and Impellicceiri participated in the telephone hearing on October 20, 2008, with the Appeals Office. Stevens requested abatement of the additions to tax and penalties assessed against the company on the basis of reasonable cause. She did not challenge the amounts of tax due. She proposed that, in lieu of the lien filings and proposed levies, the IRS would enter into an installment agreement with the company whereby the company would pay the IRS $5,000 per month.

On October 25, 2010, Stevens faxed a six-page document to the Appeals Office explaining further the company's argument that the IRS should abate the additions to tax and penalties.

In October 2010, Stevens laid off all the company's employees.

In November 2010, the company ceased operations. Stevens became employed as information-security manager for Shared Health, Inc.

On November 30, 2010, the IRS issued an administrative summons to Wachovia Bank seeking the bank records of the company for the period October 1, 2009 to 2010. The summons was issued as part of the IRS's investigation of Stevens for trust-fund-recovery-penalty liabilities. The summons stated that it

**[*22]** concerned the "matter of Sarah E Stevens, President, Stevens Technologies Inc." and "Forms 941" for the quarters 4Q 2009, 1Q 2010, and 2Q 2010.

On December 22, 2010, the Appeals Office issued a determination regarding the collection-review hearing. The determination stated that the lien filings and the proposed levies were appropriate. In a section headed "Challenges to the Existence of Amount of Liability",[12] the notice stated that the company had challenged "late filing and deposit penalties and requested penalty abatement due to reasonable cause."[13] It stated that abatement of failure-to-timely-deposit additions to tax and failure-to-timely-file additions to tax was not warranted. As a consequence, the notice determined that the following assessed amounts of additions to tax and penalties were correct:

---

[12]The company argues that the wording of the section heading indicates that the Appeals Office viewed the company as having challenged the amounts of its tax liabilities at the hearing. We disagree. The body of the section in the notice indicates that the company's challenges to the underlying liabilities consisted of challenges only to the amounts of additions to tax and penalties, not taxes.

[13]The notice did not specifically refer to the failure-to-timely-pay additions to tax even though the company challenged these additions. It appears that the notice referred to the failure-to-timely-pay additions to tax and the failure-to-timely-deposit additions to tax collectively as "deposit penalties".

[*23]

| Tax period ending | Form number or type of tax | Failure to timely file | Failure to timely pay | Failure to timely deposit | Misc. penalty |
|---|---|---|---|---|---|
| 6/30/2005 | 941 | $10,916.50 | $949.26 | n/a | n/a |
| 9/30/2005 | 941 | 6,481.45 | 166.19 | $3,323.82 | n/a |
| 12/31/2005 | 941 | 7,757.71 | 8,576.18 | 5,171.80 | n/a |
| 12/31/2005 | [1]W-2 | n/a | n/a | n/a | $360 |
| 3/31/2006 | 941 | 3,060.30 | 666.08 | n/a | n/a |
| 6/30/2006 | 941 | 748.65 | 149.73 | 332.73 | n/a |
| 9/30/2006 | 941 | 4,983.89 | 3,876.36 | 2,215.06 | n/a |
| 3/31/2007 | 941 | 9,867.60 | 6,359.12 | 4,385.60 | n/a |
| 6/30/2007 | 941 | 7,274.63 | 4,203.12 | 3,782.99 | n/a |
| 9/30/2007 | 941 | 2,632.05 | 1,345.27 | 1,973.71 | n/a |
| 12/31/2007 | 941 | 4,954.13 | 2,201.84 | n/a | n/a |
| 9/30/2008 | 941 | 2,506.02 | 612.58 | 2,892.17 | n/a |
| 12/31/2008 | 941 | 7,938.88 | 1,411.36 | 3,528.36 | n/a |
| 6/30/2009 | 941 | n/a | n/a | 4,119.86 | n/a |
| 12/31/2009 | 941 | n/a | 330.81 | 9,924.19 | n/a |
| 12/31/2009 | 940 | n/a | 5.62 | n/a | n/a |
| 3/31/2010 | 941 | n/a | 176.74 | 5,302.10 | n/a |
| 6/30/2010 | 941 | n/a | 250.65 | 7,519.34 | n/a |
| Total | | 69,121.81 | 31,280.91 | 54,471.73 | 360 |

[1]Failure to file Form W-2.

[*24] The notice also stated that the company had proposed that the lien filings and proposed levies be withdrawn in exchange for a $5,000-per-month installment agreement.  The notice stated:

> Taxpayer's history of failing to make tax deposits is protracted and egregious and weighs against support [sic] granting an installment agreement.  * * *.  Its history does not convince the Settlement Officer that it would comply with an installment payment in addition to a tax deposit, especially since it has expressed that it experiences delays in payments from its clients.

It also stated:

> An installment agreement does not provide the Government with the same advantages and protections as a filed lien to be a viable lien alternative.  A lien withdrawal under I.R.C. § 6323(j) is not appropriate.
>
> On January 24, 2011, the company filed a timely Tax Court petition for

review of the determination of the Appeals Office.

> On November 26, 2012, the IRS sent Stevens notices that it intended to levy

on her property in order to collect trust-fund-recovery penalties imposed against

her for the fourth quarter of 2009 and the first two quarters of 2010.

[*25]                                                OPINION

1.    <u>Can the Court consider the correctness of the amounts of employment taxes
      that the company reported on its Forms 941 for the fourth quarter of 2009,
      the first quarter of 2010, and the second quarter of 2010?</u>

When the IRS seeks to collect a tax liability of a taxpayer through the means

of either (1) a levy or (2) the filing of a lien,[14] the taxpayer is entitled to a hearing

before the IRS Appeals Office.  Secs. 6320(b)(1) (requiring hearing, if requested

by taxpayer, after the filing of lien), 6330(b)(1) (requiring hearing, if requested by

taxpayer, before levy).  At the hearing the taxpayer is entitled to challenge the

amount of the taxpayer's underlying tax liability that the IRS is seeking to collect,

provided that the taxpayer did not already have a chance to challenge the

underlying tax liability.  Sec. 6330(c)(2)(B); <u>see</u> <u>Katz v. Commissioner</u>, 115 T.C.

329, 339 (2000).  The underlying tax liability is any amount owed by a taxpayer,

including the tax, additions to tax, penalties, and underpayment interest.  <u>See</u> <u>Katz</u>

<u>v. Commissioner</u>, 115 T.C. at 338-339.  If the taxpayer does not challenge the

amount of the underlying tax liability with the Appeals Office, the Court cannot

---

[14]For convenience, we refer to the filing of a notice of lien as the filing of a
lien.  <u>See, e.g.</u>, <u>Katz v. Commissioner</u>, 115 T.C. 329, 333 (2000).  A lien for
federal tax arises automatically when the IRS assesses the tax.  Sec. 6321.  The
IRS secures the lien against various types of third parties through the filing of a
notice of the lien with the local recorder of deeds or similar office.  Sec. 6323(a),
(f).

[*26] consider the amount of the liability when reviewing the determination of the Appeals Office. Giamelli v. Commissioner, 129 T.C. 107, 112-116 (2007).

Among the liabilities that the IRS seeks to collect from the company are the employment taxes reflected on the company's Forms 941 for the last quarter of 2009 and the first two quarters of 2010. The company seeks to have the Court redetermine these liabilities. The company was entitled to challenge the amounts of these liabilities with the Appeals Office.[15] However, it did not make such a challenge, either in its request for a hearing, at the telephone conference with the Appeals Office, or in its submission to the Appeals Office after the hearing. The company contested only the portions of the underlying tax liabilities consisting of penalties and additions to tax. Because the company did not challenge the amounts of its employment taxes with the Appeals Office, the Court cannot consider the amounts of these liabilities. See id.

---

[15]The IRS concedes that the company did not have an opportunity to challenge its liability for taxes before the hearing with the Appeals Office. See Montgomery v. Commissioner, 122 T.C. 1, 8-10 (2004) (taxpayer who reported tax liability on return could later claim at collection-review hearing that amount was overreported).

[*27]

2.  <u>Did the company have reasonable cause for failing to file Forms 941 for a number of quarters in the years 2005 through 2008,[16] pay employment taxes for a number of quarters in the years 2005 through 2010,[17] deposit employment taxes for a number of quarters in the years 2005 through 2010,[18] pay FUTA tax for the tax year 2009, and file Form W-2 for 2005?</u>

A Federal Insurance Contributions Act (or FICA) tax is imposed on employers with respect to wages paid to employees, sec. 3111(a) and (b), and on employees with respect to wages received, sec. 3101(a) and (b). Employers must withhold the employees' shares of FICA from wages paid and pay over the withheld amounts to the IRS. Sec. 3102(a) (the employee share of FICA must be collected by the employer by deducting and withholding the amount of tax from wages as paid) and (b) (every employer required to deduct the employee share of FICA is liable for payment of the employee share of FICA). Moreover, an employer is obligated to withhold from wages amounts for the income tax owed by its employees and must pay the withheld amounts to the IRS. Secs. 3402(a)(1) ("every employer making payment of wages shall deduct and withhold upon such

---

[16]2Q, 3Q, 4Q 2005; 1Q, 2Q, 3Q 2006; 1Q, 2Q, 3Q, 4Q 2007; 3Q, 4Q 2008.

[17]2Q, 3Q, 4Q 2005; 1Q, 2Q, 3Q 2006; 1Q, 2Q, 3Q, 4Q 2007; 3Q, 4Q 2008; 4Q 2009; 1Q, 2Q 2010.

[18]3Q, 4Q 2005; 2Q, 3Q 2006; 1Q, 2Q, 3Q 2007; 3Q, 4Q 2008; 2Q, 4Q 2009; 1Q, 2Q 2010.

[*28] wages a tax determined in accordance with tables or computational procedures prescribed by the Secretary [of the Treasury]"), 3403 (every employer that is required to deduct and withhold income tax is liable for payment of the deducted amount). Once net wages are paid to the employee, the IRS credits the employee with the FICA taxes and income tax withheld, even if the employer does not pay over the withheld amounts to the IRS. See Slodov v. United States, 436 U.S. 238, 243 (1978).

The term "employment taxes", as used here, includes all three of the employer's obligations that we have just discussed: (1) employer share of FICA, (2) employee FICA withholding, and (3) employee income-tax withholding. The term also includes the FUTA tax, which is discussed later.

Each calendar quarter, an employer must file a Form 941 reporting its FICA obligations and income-tax withholding obligations for the quarter. Secs. 31.6011(a)-4(a)(1) (income-tax withholding), 31.6011(a)-1 (FICA), Employment Tax Regs. With some exceptions that are not applicable here, the Form 941 is due one month after the end of the quarter. Sec. 31.6071(a)-1(a)(1), Employment Tax Regs. The taxes reportable on the Form 941 must be paid on or before the date the Form 941 is to be filed. See sec. 6151(a) (a taxpayer who is required to file a tax

**[\*29]** return must pay the tax at the time and place fixed for filing the return).

Thus, the taxes are due one month after the end of the quarter.

Another federal tax on wages is the tax imposed by the Federal Unemployment Tax ("FUTA tax"). See sec. 3301(1). This is a 6.2% excise tax imposed on each employer with respect to the first $7,000 paid to each employee each year. Id. sec. 3306(b)(1). The employer must report its FUTA tax liability on a Form 940. Sec. 31.6011(a)-3(a), Employment Tax Regs. The Form 940 is generally due a month after the end of the calendar year. Sec. 31.6071(a)-1(c), Employment Tax Regs.

In addition to its obligation to pay quarterly employment taxes (i.e., its FICA obligations and income-tax withholdings, but not its FUTA tax) a month after the quarter has ended, an employer must make quarterly deposits of employment taxes throughout the quarter. Sec. 31.6302-1(a), (e)(1), Employment Tax Regs. The deposits must be made either monthly or semiweekly, as determined by regulation. Sec. 31.6302-1(a), (b), and (c)(1) and (2), Employment Tax Regs. The company was required to make semiweekly deposits. A deposit of a tax is treated as a payment of a tax made on the due date of the relevant tax return, determined without regard to extensions, or, if the deposit is made later, the date the deposit was made. Sec. 31.6302-1(h)(9), Employment Tax Regs. Thus,

[*30] an employer's deposit of employment taxes during the quarter is deemed to be a payment of employment taxes on the due date of the Form 941.

Where a taxpayer fails to timely file a return, including a Form 941 and a Form 940, section 6651(a)(1) imposes an "addition" to tax equal to 5% of the amount required to be shown as tax for each month the return is late, not to exceed 25% in the aggregate. Where a taxpayer fails to timely pay tax shown on a return, including a Form 941 or Form 940, section 6651(a)(2) imposes an "addition" to tax equal to 0.5% of the amount shown as tax for each month the failure continues, not to exceed 25% in the aggregate. Where a taxpayer fails to make a federal tax deposit by the date prescribed, section 6656(a) imposes a "penalty" of up to 10% of the undeposited amount. See also sec. 6656(b). Additions to tax under section 6651(a)(1) and (2) and penalties under section 6656 may be abated if a taxpayer proves that the failure was due to reasonable cause and not willful neglect. See secs. 6651(a)(1), (2), 6656(a); see also sec. 301.6651-1(c)(1), Proced. & Admin. Regs. The company claims that the additions to tax for failing to timely file Forms 941, the additions to tax for failing to timely pay quarterly employment tax, and the penalties for failing to timely make deposits of employment tax, should be

**[*31]** abated for reasonable cause.[19]  In reviewing the company's entitlement to an abatement of penalties and additions to tax determined by the IRS, the Court employs a de novo standard of review.  See Staff IT, Inc. v. United States, 482 F.3d 792, 797-798 (5th Cir. 2007).[20]  The company bears the burden of proving that it is not liable for additions to tax and penalties.  See Tax Ct. R. Pract. & Proc. 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933).  The parties agree that the company failed to timely file returns, make timely tax payments, and make timely deposits.  We hold that the company has not satisfied its burden of proving that the failures were due to reasonable cause.  The reasons are given below.

Reasonable cause for failing to timely file returns exists if the taxpayer can establish that it "exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time".  Sec. 301.6651-1(c)(1), Proced. & Admin. Regs.  Reasonable cause for failing to pay employment

---

[19]Another penalty assessed against the company was the penalty, under sec. 6721, for failing to file an information return.  The penalty applies to the failure to file Form W-2.  Sec. 6051(a).  Sec. 6724(a) contains a reasonable-cause waiver.

In its brief the company did not argue that it had reasonable cause for failing to pay the 2009 FUTA tax or file Form W-2 for 2009.  It has therefore abandoned any challenge regarding its liabilities for the addition to tax for failing to timely pay the 2009 FUTA tax and the penalties for failing to file the Form W-2 for 2009.

[20]The record does not establish, and the IRS does not contend, that the company had a prior opportunity to dispute the additions to tax or penalties, i.e., an opportunity before the hearing with the Appeals Office.

[*32] taxes exists if the taxpayer can establish that it "exercised ordinary business care and prudence in providing for payment of * * * [its] tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship * * * if * * * [it] paid on the due date." Id. Courts have also relied on this ordinary-business-care-and-prudence standard to determine whether a taxpayer has reasonable cause for failing to timely make deposits. See, e.g., Diamond Plating Co. v. United States, 390 F.3d 1035, 1038 (7th Cir. 2004); Van Camp & Bennion v. United States, 251 F.3d 862, 866, 868 (9th Cir. 2001); East Wind Indus., Inc. v. United States, 196 F.3d 499, 508 (3d Cir. 1999); Fran Corp. v. United States, 164 F.3d 814, 816-819 (2d Cir. 1999); Brewery, Inc. v. United States, 33 F.3d 589, 592 (6th Cir. 1994); see also Custom Stairs & Trim, Ltd. v. Commissioner, T.C. Memo. 2011-155, 102 T.C.M. (CCH) 1, 5 (2011). The determination of whether a taxpayer exercised ordinary business care and prudence in providing for payment of the tax liability is based on "all the facts and circumstances of the taxpayer's financial situation, including the amount and nature of the taxpayer's expenditures in light of the income (or other amounts) * * * [the taxpayer] could, at the time of such expenditures, reasonably expect to receive prior to the date prescribed for the payment of the tax." Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Death or serious illness can constitute reasonable cause. See Van Camp & Bennion v.

**[*33]** <u>United States</u>, 251 F.3d 862, 867 (9th Cir. 2001).  The majority of Courts of Appeals (that have considered the issue) recognize that financial difficulties can constitute reasonable cause, even for the failure to pay and deposit employment taxes.  <u>Diamond Plating Co. v. United States</u>, 390 F.3d 1035, 1038 (7th Cir. 2004); <u>Van Camp & Bennion v. United States</u>, 251 F.3d 862, 868 (9th Cir. 2001); <u>East Wind Indus., Inc. v. United States</u>, 196 F.3d 499, 507-08 (3d Cir. 1999); <u>Fran Corp. v. United States</u>, 164 F.3d 814, 819 (2d Cir. 1999); <u>see also</u> <u>Custom Stairs & Trim, Ltd. v. Commissioner</u>, 102 T.C.M. (CCH), at 5.  <u>But see</u> <u>Brewery, Inc. v. United States</u>, 33 F.3d 589, 592-593 (6th Cir. 1994).[21]

The company advances two arguments in support of its reasonable-cause defense.  First, it argues that the problems Stevens and her family faced prevented her from timely filing the Forms 941 and depositing and paying the taxes shown on those forms.  This argument primarily pertains to the period from 2005 until Stevens's mother died in November 2008.[22]  During this period the company did not timely file its Forms 941; it was also delinquent in its payments and deposits

---

[21]The Court of Appeals for the Fourth Circuit, the court that would decide an appeal of this case, has not considered the issue.  <u>Babcock Ctr., Inc. v. United States</u>, 2013-1 U.S. Tax Cas. (CCH) para. 50,314, at 84,099 n.12 (D.S.C. 2013).

[22]The company also claims that reasonable cause exists for its failure to meet its federal tax obligations for the second quarter of 2009.

**[*34]** of its quarterly employment taxes. Second, it argues that the TVA's failure to pay the company prevented it from paying and depositing its quarterly employment taxes for the last quarter of 2009 and the first two quarters of 2010. (In September 2009, the company paid down a large portion of its past-due federal-employment-tax liabilities (but not its penalties and additions to tax), filed its past-due Forms 941, and began filing its Forms 941 on time. For the last quarter of 2009 and the first two quarters of 2010, however, it failed to timely pay and deposit its quarterly employment-tax liabilities.)

Although we recognize that Stevens--an officer of the company--had significant health and family problems, they are not reasonable cause for the company's failure to timely file its tax returns, pay its employment taxes, and make its deposits. During the period 2005 through 2009, the period during which it claims it was unable to comply with its federal tax obligations, the company was able to continue its operations, market its services to clients and potential clients, increase its workforce, and hire an accounting firm to prepare its Forms 941. The failure of the company to file its quarterly employment-tax returns, and to make the required payments and deposits, was the result of the company's deliberate

[*35] choice to focus on business matters rather than on tax compliance. There was no reasonable cause for the company to disregard its federal tax obligations.[23]

The company's difficulties with the TVA are not reasonable cause for the company's failure to pay employment taxes and make deposits during the last quarter of 2009 and the first two quarters of 2010. During the last quarter of 2009 the company seems to have first encountered some disruptions in its revenues from the TVA. The record is murky regarding the company's first contract with the TVA, which was the one in effect at the time. The contract itself is not in the record. We do not know how much work the contract required the TVA to give the company, the schedule on which the work was to be done by the company, or the schedule on which payments were to be made by the TVA. Given the scarcity

---

[23]Stevens's health and family problems are not the only reasons the company asserts as reasonable cause for its failures during this period. The company also contends that Stevens could not sign the Forms 941 prepared for the company by the accounting firm because she was not sure they were correct. The uncertainty was supposedly due to the company's unorthodox practice of making payments to Stevens that Stevens would immediately repay to the company. According to Stevens, this practice allowed the company to qualify as a woman-owned business and receive favorable treatment in procuring government contracts. We do not agree that the uncertainty in reporting the back-to-back payments exonerates the company from failing to file its Forms 941. Having chosen to engage in these back-to-back payments, the company should have realized it would need to figure out how to report the payments for federal employment-tax purposes.

**[*36]** of details, we are not convinced that the disruptions are reasonable cause for the company's failure to make the required payments and deposits.[24]

Despite the problems with its first contract with the TVA, the company signed a second contract with the TVA in February 2010. The company claims that it thought it would receive $1.5 million of work from the TVA under the second contract. However, the second contract did not require the TVA to give the company $1.5 million of work; rather, it provided that the cost of the work could not exceed $1.5 million. Also, the company had a history of failing to make deposits, extending back to 2005. Given this history, by 2009 the company should have done more to ensure that it had the funds to pay its taxes and make its deposits. It did not. We conclude that the company did not have reasonable cause for failing to pay its employment taxes and make its deposits for the last quarter of 2009 and the first half of 2010.[25]

---

[24]Although Stevens testified that the company counted on the revenues it would earn from a prospective contract with the National Science Foundation, we are not convinced that the failure of the company to win the contract is reasonable cause for the company's failure to make the required payments and deposits. Nothing in the record suggests it would have been reasonable for the company to assume it would be awarded the contract before it was actually awarded.

[25]We do not fault the company for doing business with the TVA and maintaining its business relationship with the TVA. These decisions could have been sound. We evaluate only whether the company exercised ordinary business

(continued...)

**[*37]** We hold that the company is liable for the additions to tax and penalties.

3.      Did the IRS violate section 6330(e) by (a) issuing a summons to Wachovia Bank pursuant to its investigation of the company's president, Sarah Stevens, for the trust-fund-recovery penalties and (b) notifying Stevens it intended to levy on her assets to collect the liabilities?

The trust-fund-recovery penalty is imposed on an officer of an employer if the officer is responsible for withholding and collecting trust-fund tax such as income tax and the employees' share of FICA taxes, and willfully fails to withhold them and pay them over to the IRS.  See sec. 6672.  As detailed in the findings of fact:

- On August 12, 20, and 23, 2010, the IRS notified the company that it had filed liens and proposed to levy to collect employment taxes from the company for 16 calendar quarters, including the first quarter of 2009, the first quarter of 2010, and the second quarter of 2010.

- On August 30, 2010, the company requested a collection-review hearing with the Appeals Office.

- On November 30, 2010, the IRS issued an administrative summons pursuant to its investigation of Stevens for the trust-fund-recovery-

---

[25](...continued)
care in attempting to provide for the payment and deposit of its federal employment taxes.  We find that it did not.

**[\*38]** penalty for the fourth quarter of 2009 and the first two quarters of 2010.

- On December 22, 2010, the Appeals Office issued a notice of determination regarding the company's hearing.

- On January 24, 2011, the company filed a petition for review of the determination of the Appeals Office.

- On November 26, 2012, the IRS sent Stevens notices that it intended to levy on her personal property in order to collect trust-fund-recovery penalties from her for the fourth quarter of 2009 and the first two quarters of 2010.

Section 6330(a)(1) provides that, in general, the IRS can make no levy on any taxpayer's property unless it notifies the taxpayer of the right to a collection-review hearing. Section 6330(e)(1) provides that if the taxpayer requests a hearing "the levy actions which are the subject of the requested hearing" are suspended until the hearing and the appeal from the hearing are completed. The company requested a hearing to consider levy actions to collect (among other things) the company's employment-tax liabilities for the fourth quarter of 2009, the first quarter of 2010, and the second quarter of 2010. Section 6330(e) suspends any levy action to collect these liabilities from the company. Stevens argues that

[*39] section 6330(e) prohibited the IRS from issuing the November 26, 2012

letter and the summons because the company's appeal of the determination of the

Appeals Office was pending when those documents were issued.  However, the

levy mentioned in the November 26, 2012 letter, and the summons, pertained to

Stevens's liability for the trust-fund-recovery penalty.  This liability is different

from the company's liability for employment taxes.  See United States v.

Pomponio, 635 F.2d 293, 298 (4th Cir. 1980), cited in Freeman v. Commissioner,

101 T.C.M. (CCH) 1173, 1174 (2011).  Therefore, section 6330(e) does not limit

the IRS's ability to levy to collect the trust-fund-recovery penalties from Stevens.

4.    Did the Appeals Office abuse its discretion by failing to accept the
      company's installment-agreement proposal?

At the telephone hearing with the Appeals Office, the company proposed to

pay its liabilities in monthly installments of $5,000.  In exchange for the

installment-payment plan, the company proposed that the IRS would withdraw its

lien filings and withdraw its proposal to levy.  The Appeals Office determined that

these proposals would not improve the IRS's prospects for collecting the

company's liabilities.

The IRS is authorized to enter into a written agreement allowing a taxpayer

to pay tax in installment payments if the IRS determines that the "agreement will

**[\*40]** facilitate full or partial collection of such liability." Sec. 6159(a). The decision to accept or reject a proposed installment agreement is committed to the IRS's discretion. Sec. 301.6159-1(c)(1)(i), Proced. & Admin. Regs. The IRS is authorized to withdraw a lien filing under various circumstances, including (1) if the taxpayer has entered into an installment agreement or (2) if the IRS has determined that withdrawal of the lien filing would facilitate the collection of the liability. See sec. 6323(j)(1)(B) and (C). The decision to withdraw a lien filing is committed to the IRS's discretion.[26] The Appeals Office determined that the company's history of failing to pay its tax liabilities weighed against accepting the installment agreement and forgoing the substantial rights that were secured by the filing of a lien. We are unable to conclude that the Appeals Office abused its discretion in sustaining the lien filings and proposal to levy.

The determination of the Appeals Office is sustained.

To reflect the foregoing,

An order denying respondent's motion and decision for respondent will be entered.

---

[26]Sec. 6323(j)(1) provides that "The [Treasury] Secretary may withdraw a notice of a lien filed under this section". (Emphasis added.)